# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAULA JEAN ROBERTS,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ANDREW M. SAUL[1],<br>Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:18-cv-0604 - JLT<br><br>ORDER DENYING THE COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT AND REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(G)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF PAULA JEAN ROBERTS AND AGAINST DEFENDANT ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY |

Paula Jean Roberts asserts she is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff seeks judicial review of the decision denying her application for benefits, asserting the administrative law judge erred in evaluating her credibility. Because the ALJ failed to apply the proper legal standards, the Commissioner's motion for summary judgment (Doc. 20) is **DENIED** and the action is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **BACKGROUND**

In September 2013, Plaintiff filed her application for benefits, in which she alleged disability due to a low back injury and right eye injury beginning October 25, 2011. (Doc. 7-4 at 3) The Social

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

Security Administration denied the applications at the initial level and upon reconsideration. (*See generally* Doc. 7-4) Plaintiff requested a hearing and testified before an ALJ on July 14, 2016. (Doc. 7-3 at 19, 44) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on November 4, 2016. (*Id.* at 19-27) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on February 22, 2018. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Medical Background and Opinions**

In January 2001, Plaintiff was working as a campus supervisor "when she slipped and fell on an icy sidewalk." (Doc. 7-8 at 19) Plaintiff reported the injury and was diagnosed with a "low back strain" for which she received medical treatment, including physical therapy. (*Id.* at 19, 20)

Plaintiff had an MRI of her lumbar spine taken on April 1, 2001. (Doc. 7-8 at 20) Dr. Hosam Moustafa found "evidence of disc desiccation with decreased hydration and narrow disc heights at L4-5 and L5-S1." (*Id.*) In addition, Plaintiff had "a mild posterior disc bulge at L5-S1" and a "small central posterior disc herniation at L4-5." (*Id.*) Plaintiff reported "her back pain increased over the years," and she resigned in October 2007 "due to her back pain." (*Id.* at 19)

On October 24, 2011, Plaintiff was working for a fertilizer service in a cornfield when she bumped her head on the tractor cab and injured her right eye. (Doc. 7-8 at 3) She suffered a large retinal tear, for which she had emergency laser surgery on November 1, 2011. (*Id.*; Doc. 7-14 at 53)

Dr. Robert Caton, an orthopedic surgeon, evaluated Plaintiff on February 2, 2012, "for the first time in regard to her … low back [injury] which occurred more than ten years ago." (Doc. 7-9 at 26) Dr. Caton observed that Plaintiff was "in obvious distress" and moved "in a somewhat slow, awkward

3

fashion, slightly leaning forward at the waist." (*Id.*) Dr. Caton determined Plaintiff's range of motion was "less than 5 degrees of extension," and noted she complained of pain at 20 degrees with rotation. (*Id.*) He opined Plaintiff needed a new MRI and should be referred to a neurosurgeon. (*Id.* at 28)

Plaintiff underwent the MRI of her lumbar spine on April 3, 2012. (Doc. 7-8 at 21) Dr. Gordon Zink-Brody determined Plaintiff thoracic spine showed "mild disc desiccation at all levels with minimal annular bulging of T11-12 slightly flattening the ventral thecal sac without causing significant spinal stenosis." (*Id.*; *see also* Doc. 7-10 at 7) He found Plaintiff's lumbar spine showed "disc desiccation … with loss of disc height and mild annular bulging" at the L4-5 and L5-S1 levels." (*Id.*) Dr. Zink-Brody concluded there "was global disc desiccation, annular bulging of multiple discs without frank disc extrusion or central canal stenosis, mild bilateral lateral recess narrowing at L4-5, discogenic osteophyte encroaching on the existing nerve roots at L5-S1 with mild left foraminal stenosis also contributed to by facet hypertrophy." (*Id.*)

Dr. Beth Bathgate performed an agreed medical evaluation regarding Plaintiff's low back injury on April 10, 2012. (Doc. 7-8 at 18) She noted at that time, Plaintiff was taking tramadol, naproxen, and carisoprodol. (*Id.* at 21) Plaintiff reported she had "constant … throbbing, shooting, aching and burning" pain "in the low back into the left buttock and left leg to the foot." (*Id.* at 22) Plaintiff indicated her pain interfered "with her ability to write or type," walk one block, lift ten pounds, sit for one half hour, climb a flight of stairs, squat, kneel, and stand for half an hour. (*Id.*) Dr. Bethgate observed Plaintiff "had a normal gait and was able to walk on toes;" but "[s]he was unable to walk on heels due to pain." (*Id.* at 24) Dr. Bethgate found Plaintiff had "tenderness and spasm over the left side of the low back from L4 to S1 and paraspinal muscles diffusely." (*Id.*) Plaintiff's range of motion in her back was reduced from 60º to 25º with flexion, 25º to 10º with extension, and 25º to 15º with lateral bending on the left. (*Id.*) Dr. Bethgate noted Plaintiff had normal straight leg raises bilaterally and her "[s]ensation to pinprick [was] intact in both lower extremities except decreased over the left leg diffusely." (*Id.*)

On April 11, 2012, Dr. Caton observed that Plaintiff "had very poor motion" and did "not walk normally on heels and toes." (Doc. 7-9 at 21-22) He opined Plaintiff had "failed recent attempts at conservative care" and referred her to Dr. Remington, a neurosurgeon. (*Id.* at 22)

Dr. Philip Levy performed an agreed medical evaluation on April 24, 2012. (Doc. 7-8 at 6) Plaintiff described seeing "many floaters" in her right eye, and stated she could not "see as well at distance or near" since her injury. (*Id.*) In addition, she stated that she saw "a strobe light" or "a zig-zag flashing light" in the corner of her right eye. (*Id.*) Dr. Levy determined Plaintiff's visual acuity was 20/60 in the right eye and 20/30 in the left eye. (*Id.* at 10) He found Plaintiff's retinal tear was "well sealed" and "[t]here was no optic atrophy or papilledema." (*Id.*) Dr. Levy opined Plaintiff's "complaint that she sees many floaters in her right eye… is correct and caused by benign vitreous opacities, due to physiologic aging." (*Id.* at 12) He believed Plaintiff's complaint of a strobe light was "due to a vitreous traction on her retina as the vitreous separates from the retina," and it would "gradual decrease over the next several months." (*Id.*) Dr. Levy recommended Plaintiff "[o]btain prescription bifocal safety glasses to improve… [her] vision and protect… [her] eyes from additional injury." (*Id.*) He opined Plaintiff was "able to sit, stand, walk, move about, carry, handle objects, speak and travel without difficulty." (*Id.* at 14) According to Dr. Levy, Plaintiff's "primary problem was a slight decrease in vision … may limit her eligibility for a variety of occupations which may require … best-corrected vision better than 20/30." (*Id.*)

In May 2012, Dr. Benjamin Remington performed the neurosurgical consultation. (Doc. 7-15 at 2) Dr. Remington determined Plaintiff had "good range of motion" and observed that she had a normal gait. (*Id.* at 3) He found Plaintiff's strength was "5 out of 5 in the lower extremities" and her sensation was intact. (*Id.*) Dr. Remington determined Plaintiff was "a possible surgical candidate" and discussed "the possibility of doing surgery versus epidural steroid injections." (*Id.*) Plaintiff chose "to start with the epidural steroid injections," and Dr. Remington emphasized she should also "do daily stretching and strengthening exercises." (*Id.*) Plaintiff received the first epidural injection in July 2012, which "gave her 4-5 weeks of relief." (Doc. 7-9 at 7)

In August 2012, Dr. Caton determined Plaintiff should continue with conservative care and prescribed "some anti-inflammatory and pain cream, noting the cream "help[ed] reduce pain and muscle spasm." (Doc. 7-9 at 17-18)

Plaintiff had a second epidural injection in October 2012, which "lessened her pain and lessened her discomfort." (Doc. 7-9 at 16; *see also* Doc. 7-15 at 29) On October 24, Dr. Caton observed that

Plaintiff was "moving about fairly well," and her "motor tone and sensation appear[ed] to be intact." (*Id.*) He opined Plaintiff needed "to proceed in a slow cautious fashion … with no heavy lifting, pushing, pulling or comparable activity." (*Id.*) In addition, Dr. Caton stated Plaintiff could "[]not work for two months." (*Id.*)

Dr. Caton saw Plaintiff on December 6, 2012, at which time he noted Plaintiff walked "with an abnormal gait, slightly crouched forward." (Doc. 7-9 at 13) He also observed that Plaintiff had "difficulty getting on and off the examination table" and "walking on heels and toes." (*Id.*) Plaintiff complained of some left foot weakness, and Dr. Caton determined she had reduced reflexes on the right, and "trace" reflexes on the left. (*Id.*) He again opined Plaintiff "cannot work for a period of two months," and he requested authorization for a discogram at the L4-L5 levels. (*Id.*)

On December 11, 2012, Dr. Levy performed an agreed medical re-evaluation. (Doc. 7-8 at 27) Dr. Levy determined Plaintiff's visual acuity was 20/50 in her right eye and 20/30 in the left. (*Id.* at 31) He opined Plaintiff's prognosis was guarded because she "may develop additional retinal tears as the vitreous separates from the retina." (*Id.* at 33) Dr. Levy believed Plaintiff would "need ophthalmological care for the rest of her life to detect and treat any additional retinal tears or any retinal detachment(s)." (*Id.* at 36)

Dr. Mohinder Nijjar performed an agreed medical evaluation regarding Plaintiff's back injury on December 20, 2012. (Doc. 7-16 at 2) Plaintiff described the pain in her back as "3-8/10 in intensity, increasing with sitting for an hour, lying down for 30 minutes, bending forward for five minutes, [and] walking for 30 minutes." (*Id.* at 3) Dr. Nijjar determined Plaintiff had "straightening of the lumbar curvature and tenderness of the lumbar spine which extend[ed] from L2 through S1." (*Id.* at 10) Plaintiff exhibited "decreased sensation over the outer aspect of the left thigh and over the calf area," with both touch and pinprick. (*Id.* at 11) Dr. Nijjar opined that if Plaintiff's pain was not controlled with conservative treatment, "she may be a surgical candidate for excision of the disc at L4-5 and fusion at the same time." (*Id.* at 13)

In January 2013, Dr. Caton noted Plaintiff "move[d] about the office in a very slow fashion," and she "complain[ed] of left leg weakness when trying to get on and off the examination table." (Doc. 7-9 at 10) Dr. Caton determined Plaintiff had "weakness of the left ankle," and "decreased sensation

over the dorsal aspect of the [right] foot." (*Id.*)

In May 2013, Dr. Caton observed that Plaintiff "move[d] very slowly complaining of pain and she [walked] with a slightly crouched gait." (Doc. 7-9 at 7) Dr. Caton opined Plaintiff's condition "worsened" overall, and she should return to Dr. Remington for re-evaluation because "the conservative care route [had] not worked" and she was ready for surgery. (*Id.*) Dr. Caton instructed Plaintiff to "not overdo her lifting, pushing, pulling or comparable activity." (*Id.*) He told Plaintiff to return once she had a discogram. (*Id.*)

In September 2013, Dr. Caton noted Workers Comp denied the request for a discogram. (Doc. 7-9 at 4) Dr. Caton found Plaintiff's "motor tone and sensation remain[ed] intact," though she exhibited tenderness over the L5-S1 area. (*Id.* at 5)

Dr. Samuel Rush performed a consultative examination on January 31, 2014. (Doc. 7-9 at 73) Dr. Rush determined Plaintiff's visual acuity was 20/100 in her right eye and 20/30 in her left. (*Id.* at 74) Plaintiff was "able to walk without difficulties," including toes and heels, and had negative straight leg raising tests. (*Id.* at 76) Dr. Rush found Plaintiff had "100% range of motion," and her senses were "[n]ormal to touch, temperature and pinprick." (*Id.*) Dr. Rush concluded Plaintiff could lift and carry "50 pounds occasionally and 25 pounds frequently;" sit, stand, and walk without restriction; and perform postural activities without restriction. (*Id.* at 76-77)

Dr. Clarence Ballard reviewed available records and completed a physical residual functional capacity assessment regarding Plaintiff's current level of functioning on February 26, 2014. (Doc. 7-4 at 8-10) Dr. Ballard opined Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 9) He determined Plaintiff did not have any postural, manipulative, or environmental limitations. (*Id.*) Dr. Ballard noted he gave "[g]reat weight" to the opinion from Dr. Rush, and he opined Plaintiff's "statements regarding [her] symptoms [were] not wholly consistent with [the] established [medical record]." (*Id.*)

In April 2014, Dr. Caton noted Plaintiff "complain[ed] of severe pain and radiation of pain from her back into the left lower extremity," and that she was unable to do activities of daily living. (Doc. 7-

10 at 9) He found Plaintiff's motor abilities and sensation remained intact. (*Id.*) Dr. Caton again opined Plaintiff needed a neurosurgical consultation. (*Id.*)

Dr. P. Frye reviewed the medical record related to Plaintiff's request for reconsideration on July 11, 2014, and noted Plaintiff had a "[v]ery unremarkable" consultative examination. (Doc. 7-4 at 18) However, Dr. Frye observed the "MRI finding[] of L5S1 root involvement [was] significant." (*Id.*) Dr. Frye opined that as a result, Plaintiff's residual functional capacity should "reduce[d] to light." (*Id.*) Specifically, Dr. Frye opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.* at 19-20) Dr. Frye also opined Plaintiff was limited to occasional stooping or bending, and she could perform all other postural activities on a frequent basis. (*Id.* at 20)

Plaintiff visited the Ortho-Pod Practice in September 2014, due to her "history of chronic lower back and left leg pain." (Doc. 7-13 at 23) Upon examination, Plaintiff's gait was "normal with heel-toe progression." (*Id.*) She was able to "walk on her heels but it was painful," and she reported that she had bone spurs injected twice. (*Id.*) The unidentified examiner observed that Plaintiff "was definitely weaker on the left than the right" with squats, and her "deep tendon reflexes were difficult to elicit in knees and ankles." (*Id.*) Plaintiff was referred "to physical therapy two times a week for 4 [weeks] for core strengthening, pelvic tilts[,] lumbosacral stretches, [and] iliotibial band stretching." (*Id.* at 24)

In March 2015, Dr. David Wells evaluated Plaintiff upon the referral of another physician, due to "a long-standing history of bilateral plantar heel pain and more recent[] posterior heel pain [that was] worse on the right side." (Doc. 7-14 at 36) Dr. Wells took x-rays of Plaintiff's feet and diagnosed her with Achilles tendonitis, calcaneal spur, and plantar fasciitis. (*Id.*) Dr. Wells believed Plaintiff had "exhausted conservative care with respect to the plantar fasciitis" and "discussed surgical intervention." (*Id.*) He informed Plaintiff that the heel surgery "would involve 6 weeks in a cast followed by 3 weeks or so in a fracture walker booth with physical therapy," and the postoperative pain "may last 4-6 months sometimes up to a heal." (*Id.*)

Plaintiff elected to proceed with the surgery on her right foot, which was performed on April 17, 2015. (Doc. 7-14 at 31) Dr. Wells performed an endoscopic plantar fascia release and retrocalcancal

osteoectomy with reattachment of the Achilles tendon. (*Id.*) Plaintiff was directed to not place any weight on her right foot and use a "rollabout scooter." (*Id.* at 28) On May 28, Dr. Wells found Plaintiff was "doing very well" and recommended she perform "gentle range of motion exercises." (*Id.* at 25-26) He determined Plaintiff could start physical therapy in two weeks. (*Id.*)

In June 2015, Dr. Wells opined Plaintiff was "doing fairly well," though Plaintiff reported she had "significant back pain." (Doc. 7-14 at 23) Lumbar spine x-rays were negative, and did not show significant joint space abnormalities. (*Id.* at 41) Plaintiff continued to use the scooter and "just started physical therapy," which she did with a fracture walker boot. (*Id.* at 23-24) Dr. Wells observed that Plaintiff had "[m]ild edema… about the ankle and rear foot." (*Id.* at 24) He "[r]ecommended range of motion exercise and a 'runners stretch' activity to increase her dorsiflexion" beyond the 90 degrees she was able to do during the examination. (*Id.*)

Plaintiff continued to wear her boot and use the rollabout scooter in July 2015, about twelve weeks after the surgery. (Doc. 7-14 at 21) Dr. Wells found Plaintiff had "mild edema about the peritendinous region" and "[s]light tenderness on palpation… but not significant." (*Id.* at 22) He directed Plaintiff to continue with physical therapy and "recommended alternating between wearing the boot for a couple of hours and then wearing a regular shoe for a couple hours." (*Id.*) Dr. Wells noted Plaintiff could "use crutches as an assist or transition into a cane," and perform "[p]rogressive weightbearing activities as tolerated." (*Id.*)

In August 2015, Dr. Wells noted Plaintiff completed physical therapy and "renewed her physical therapy prescription." (Doc. 7-14 at 14) Plaintiff continued to use a crutch and reported "some tenderness when she put[] the right heel on the ground." (*Id.* at 13) Dr. Wells recommended the physical therapist "emphasize increasing strength," and "stringing recommended … limiting the crutch [use]," and for Plaintiff to begin using a cane and walking for exercise. (*Id.* at 14) He "[a]lso recommended walking in [a] pool as she [would] be somewhat buoyant." (*Id.*)

The same month, Dr. Lenita Williamson evaluated Plaintiff for right knee pain. (Doc. 7-13 at 21) Dr. Williams found Plaintiff had mild effusion and tenderness in the medial joint. (*Id.*) She also referred Plaintiff to physical therapy. (*Id.* at 22)

In September 2015, Plaintiff complained of stiffness in her neck. (Doc. 7-13 at 36) Dr. Avila

9

determined Plaintiff exhibited tenderness and muscle tenderness, and recommended she receive physical therapy, but Plaintiff declined a referral. (*Id.*) Dr. Avila noted Plaintiff said "she [would] ask her current physical therapist about some home exercise she can do for her neck." (*Id.*) Dr. Wells opined Plaintiff's "heel on the right side actually look[ed] good," and she was discharged from his care. (Doc. 7-14 at 12)

In November 2015, Plaintiff returned to Dr. Wells for a follow-up appointment. (Doc. 7-14 at 9) She reported that she was "walking a couple of miles per day." (Doc. 7-14 at 9) Dr. Wells took imaging of her right foot and found "the anchors [were] almost resorbed" and she had "[v]ery little bony regrowth." (*Id.*) He gave Plaintiff a new prescription for physical therapy and directed her to continue walking for exercise. (*Id.*)

In January 2016, Plaintiff stated she was "able to walk around the block… with little pain," and she would put her boot back on around 1 or 2pm. (Doc. 7-14 at 5) Dr. Wells again recommended she "[c]ontinue walking around the block even twice a day if possible" and continue with physical therapy. (*Id.* at 6)

**B.     Administrative Hearing Testimony**

Plaintiff testified before an ALJ on July 14, 2016. (Doc. 7-3 at 47) She reported that she could no longer work due to a low back injury and "[b]oth of [her] feet are bad." (*Id.* at 48-49) Plaintiff said she felt "[a] lot of burning and stiffness" with her back pain. (*Id.* at 50) She stated the pain was "there most of the time, but it comes and goes" and would increase with activity. (*Id.*)

She reported that she had received epidural injections in her back, and "the first shot really helped, but the second one didn't help much." (Doc. 50) Plaintiff reported she had prescription pain medication, but she "can't really take it" because it made her sick. (*Id.* at 51) She stated she also received a prescription for anti-nausea medication to take with the pain pills, but she would "only take it if [she] really, really [had] to," because she would "get really sick and ... really tired." (*Id.*) Plaintiff said to alleviate her pain, she would "sit on ice or lay on ice a lot," and she used a TENS unit "[p]robably three times a week." (*Id.*) She reported she was no longer using an assistive device for ambulation. (*Id.*)

Plaintiff said she also had issues with her feet, which had "bone spurs sticking in the Achilles

tendon." (Doc. 7-3 at 52-53) She testified that she had "shots in [both] feet and [used] orthotics" in her shoes. (*Id.* at 55) Plaintiff said the physician asked her which foot she would like to have surgery on first, and she chose the right foot. (*Id.* at 53) Plaintiff said she had completed eight months of physical therapy, "had a cast and two boots," and her foot was "still healing." (*Id.*) She reported that she would "try to walk around the block a couple times every day," which was "a little city block... [with] like four houses on each side." (*Id.*) Plaintiff said she could not "seem to walk more than a couple times around the block without it really swelling and hurting," and her physician "said it could take a year and a half to heal up," so she was "just waiting." (*Id.*) She stated that the physicians were trying to see if the "foot heals up pretty good," because she "needs back surgery," which would require her "to be on a walker for a while." (*Id.* at 53-54)

Plaintiff estimated she could sit "20, 30 minutes" at one time; "stand maybe 15, 20 minutes;" and "walk a couple times around the block." (Doc. 7-3 at 56) She said she tried "not to lift much at all," and did not "want to lift over 15 [pounds] or so." (*Id.*) Plaintiff explained that when grocery shopping, she would "lift a bag here and there, but [she] had people help [her] out of the store." (*Id.*) She testified she did some household chores such as dishes, folding clothes, and microwave meals such as "a packet of oatmeal every morning and... a lean cuisine for lunch." (*Id.* at 56) Plaintiff stated her daughter did "the deep cleaning." (*Id.*) She reported she did not go outside much, and would "usually just go to the store, the doctor, or to [her] mom's house," which was four miles away. (*Id.* at 57) Plaintiff said she also would get in a pool "and try to walk around and move around a little bit." (*Id.*)

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined first that Plaintiff did not engage in substantial activity "from ger alleged onset date of October 25, 2011, through her date last insured of March 31, 2015." (Doc. 7-3 at 21) Second, the ALJ found Plaintiff's severe impairments included "lumbar degenerative disc disease and obesity." (*Id.*) At step three, the ALJ determined these impairments did not meet or medically equal a listed impairment. (*Id.* at 22-23) Next, the ALJ opined:

> [T]he claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) in that the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six hours in an 8-hour day, and stand and/or walk for six hours in an 8-hour day. She can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and frequently balance, stoop, kneel, crouch, and crawl.

11

(*Id.* at 24) With this residual functional capacity, the ALJ found Plaintiff was "unable to perform any past relevant work." (*Id.* at 27) However, the ALJ found Plaintiff was able to work in "other occupations with jobs existing in significant numbers in the national economy." (*Id.*) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 28-29)

## **DISCUSSION AND ANALYSIS**

Plaintiff asserts the ALJ did not identify legally sufficient reasons to reject her credibility. (Doc. 17 at 18-21) Defendant argues the ALJ's decision should be affirmed because "[t]he ALJ appropriately found Plaintiff's testimony not fully supported by the record." (Doc. 20 at 8) According to the Commissioner, "the ALJ properly explained that [her testimony] was not consistent with the objective evidence and other evidence in the record." (*Id.* at 9)

**A.    The ALJ's Credibility Analysis**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (evaluating credibility, the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and daily activities).

According to the ALJ, Plaintiff's "medically determinable impairments could be reasonably expected to cause the alleged symptoms." (Doc. 7-3 at 25) However, the ALJ found Plaintiff's

"statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (*Id.* at 26) In support of this credibility finding, the ALJ also cited the treatment received by Plaintiff and her level of activity. (*Id.*)

1. Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" may constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999). However, "summariz[ing] the medical evidence supporting [the] RFC determination... is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to ... ensure that the claimant's testimony was not arbitrarily discredited." *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). Consequently, "the observations an ALJ makes as part of the summary of the medical record are not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 WL 4138577 at *13 (E.D. Cal. Aug. 3, 2016).

The ALJ opined Plaintiff's "allegations of severe symptoms are not supported by the clinical evidence," and followed this finding with a chronological recitation of evidence related to Plaintiff's back pain, beginning with the MRI in April 2012. (Doc. 7-3 at 23; *see also id.* at 23-25) After discussing the medical opinion evidence, the ALJ again turned to Plaintiff's credibility, stating that Plaintiff's "allegations of severe symptoms have not resulted in significant limitations in her physical functioning and are not supported by the clinical evidence." (*Id.* at 26) However, this Court previously determined that unless the ALJ links the claimant's testimony to "the observations an ALJ makes as part of the summary of the medical record [this is] not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016).

In *Brown-Hunter*, the claimant argued the ALJ failed to provide clear and convincing reasons for rejecting her symptom testimony. *Id.*, 806 F. 3d at 491. The district court identified inconsistences in the ALJ's summary of the medical record that it opined gave rise to reasonable inferences about Plaintiff's credibility. *Id.* On appeal, the Ninth Circuit determined the ALJ failed to identify the

testimony she found not credible and did not link that testimony to support the adverse credibility determination. *Id.* at 493. The Court explained that even if the district court's analysis was sound, the analysis could not cure the ALJ's failure. *Id.* at 494.

As in *Brown-Hunter*, it appears the ALJ provided sufficient analysis to support a conclusion that Plaintiff's complaints and asserted limitations were inconsistent with the medical record but failed to point specifically to the portions of the hearing testimony the ALJ found to be incredible. Indeed, it appears that the ALJ analyzes not Plaintiff's testimony but the credibility of her complaints to the medical providers when compared to the objective medical findings, and her reports related to the treatment received. (*See* Doc. 7-3 at 26) Because the ALJ failed to link the credibility findings from the medical record to Plaintiff's testimony and reject the limitations to which she testified, the ALJ made an error the Court is unable to cure. *See Brown-Hunter*, 806 F. 3d at 494.

2. Treatment received

In assessing credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged). However, "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exists." *LaPeirre-Gutt v. Astrue*, 382 Fed. Appx. 662, 664 (9th Cir. 2010).

The ALJ observed that Plaintiff had "a long history of conservative treatment for the ... listed impairments." (Doc. 7-3 at 24) In addition, the ALJ noted: Plaintiff reported she had "bone spurs in the heels of both feet (Exhibit 8E; 10E). However, the claimant has not received treatment consistent with a chronic pain syndrome such as biofeedback, acupuncture, or attendance at a pain management clinic." (*Id.*) Further, ALJ noted that "[i]n September 2015, physical therapy was recommended, but she declined and wanted home exercises." (*Id.*) Plaintiff contends in making these findings, the ALJ engaged in a selective reading of the treatment record. (Doc. 17 at 19-20)

According to Plaintiff, the ALJ erred because he failed to acknowledge that Plaintiff had a surgical procedure on her right foot and anticipates surgery on her left foot. (Doc. 17 at 19-20) In

addition, Plaintiff contends:

> Nor does the ALJ recognize that multiple physicians assessed that conservative care had failed and recommended back surgery for years pending the resolution of Ms. Roberts' workers compensation claim. (AR 353, 359, 431, 586, 692) Or that Plaintiff was administered several nerve blocks to her lower back by a pain management specialist. (AR 361, 584, 591, 647-648, 692) The ALJ references that "[i]n September 2015, physical therapy was recommended, but she declined and wanted home exercises." (AR 25, citing AR 549) However, the treatment note cited by the ALJ refers to the recommendation for physical therapy for neck pain Plaintiff had been experiencing for the prior five days. (AR 549) The treatment note indicates that Ms. Roberts "will ask her current physical therapist about some home exercises she can do for her neck." Id. The ALJ apparently failed to understand that Ms. Roberts had been in physical therapy for many months. (AR 52, 61, 534, 553, 556, 558, 562, 563-568) The ALJ's apparent approach of plucking selective bits of the record to support his conclusion is prohibited.

(Doc. 17 at 20)

In response, Defendant contends the ALJ "permissibly considered that Plaintiff's back impairment generally received conservative treatment." (Doc. 20 at 10, citing *Johnson v. Shalala*, 60 F.3 1428, 1434 (9th Cir. 1995) [conservative course of treatment suggested "a lower level of both pain and functional limitation"]); *Walter v. Astrue*, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) [ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection]) According to Defendant, "the ALJ reasonably considered the lack of surgical recommendation and generally conservative treatment were not consistent with Plaintiff's allegations of disabling pain." (*Id.* at 1)

Importantly, as Plaintiff argues, the ALJ fails to address significant portions of the medical record. For example, though the ALJ notes Plaintiff had "bone spurs in the heels of both feet," and criticized her for the lack of "biofeedback, acupuncture, or attendance at a pain management clinic" treatments (Doc. 7-3 at 26), the ALJ failed to discuss the fact that Plaintiff received injections in her heels. (*See* Doc. 7-13 at 23) More critically, the ALJ fails to address the fact that Dr. Wells determined Plaintiff needed surgical intervention for both feet, or discuss surgical procedure performed by Dr. Wells in March 2015—which included an endoscopic plantar fascia release and retrocalcancal osteoectomy with reattachment of the Achilles tendon—and clearly was not a "conservative" treatment.

In addition, the ALJ failed to discuss the epidural injections Plaintiff received for her back, or the finding of Plaintiff's treating physician, Dr. Caton, that Plaintiff "failed... attempts at conservative

15

care" and "the conservative care route [had] not worked." (Doc. 7-9 at 7, 22) Courts have questioned whether such an injection constitutes conservative treatment. *See, e.g. Garrison v. Colvin*, 759 F.3d 995, 1015 n. 20 (9th Cir. 2014) (expressing "doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment"); *Oldham v. Astrue*, 2010 WL 2850770, at *9 (C.D. Cal. 2010) (noting that injections are "performed in operation-like settings" and finding they are not a form of conservative treatment); *Tagle v. Astrue*, 2012 WL 4364242 at *4 (C.D. Cal. Sept. 21, 2012) ("While physical therapy and pain medication are conservative, epidural and trigger point injections are not"). Nevertheless, the ALJ did not properly evaluate the treatment Plaintiff received, because he failed to discuss either the injections or the surgical intervention. Accordingly, this factor does not support the adverse credibility determination.

3. Daily activities

An "ALJ [is] permitted to consider daily living activities in [a] credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Daily activities "form the basis for an adverse credibility determination" when: (1) the daily activities contradict the claimant's other testimony or (2) the daily activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (factors to consider in evaluating a claimant's testimony include "whether the claimant engages in daily activities inconsistent with the alleged symptoms" and whether "the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting"). Neither of these bases is supported by the ALJ's decision or the record.

The ALJ noted he gave "great weight to the claimant's fairly wide range of daily activities," which he found included "light duty housework, watching television, washing dishes, and laundry." (Doc. 7-3 at 26) The ALJ also noted Plaintiff stated she "prepared simple meals, drove, went out alone, shopped every two weeks for two hours, and visited with others." (*Id.*) The ALJ does not make any specific findings how or whether these activities transfer to a work setting. Indeed, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008). Likewise, the record does not indicate that Plaintiff could—or did—perform any of the activities identified for a substantial

part of each day. Thus, Plaintiff's reported daily activities do not support the adverse credibility decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa*, 367 F.3d at 886 (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834. However, courts retain flexibility in crediting testimony as true, and a remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints …"). Consequently, the Court finds a remand for further proceedings and re-evaluation of Plaintiff's testimony is appropriate.

///

///

**CONCLUSION AND ORDER**

As set forth above, the ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Consequently, the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these grounds it offers no findings on the remaining issues presented in Plaintiff's opening brief. Accordingly, the Court **ORDERS**:

1. The Commissioner's motion for summary judgment (Doc. 20) is **DENIED**;
2. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
3. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Paula Jean Roberts and against Defendant, Andrew M. Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **August 13, 2019**   /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE